UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| THOMAS ELLISON, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:09-cv-0028-RLY-TAB |
| | ) | |
| REGENT AEROSPACE CORP., | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Thomas Ellison ("Plaintiff"), formerly served as Director of Sales and Marketing in the Survival Solutions business and product line for the defendant, Regent Aerospace Corp. ("Regent"). In this diversity of citizenship action, Plaintiff claims that he was wrongfully denied a commission on a $2.4 Million Dollar agreement entered into between Regent and Vision Airlines ("Vision"). Plaintiff's Complaint is comprised of two claims: (1) a claim under Indiana's Wage Payment Statute for wages due and owing to him; and (2) a claim for breach of contract under Indiana common law. Regent now moves for summary judgment. For the reasons set forth below, the court **GRANTS** Regent's motion.

I.  **Summary Judgment Standard**

Disposition of a case on summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving

1

party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The record and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir. 1996).

The moving party bears the burden of demonstrating the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden may be met by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. If the moving party meets its burden, the adverse party "may not rest upon the mere allegations or denials of the adverse party's pleading," but must present specific facts to show that there is a genuine issue of material fact. FED. R. CIV. P. 56(e); *see also National Soffit*, 98 F.3d at 265 (citing *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991)).

## II. Facts

### A. Background

1. Regent operates as an aircraft interior reconfiguration, restoration, refurbishing, and refreshing company. (Affidavit of Tim Garvin ("Garvin Aff.") ¶ 4). Regent provides repair and overhaul products and services in four categories: Seating Division, Airbase Services, Inc., Windows Services, and Survival Solutions. (*Id.*).

2. Regent's headquarters are located in Valencia, California. (Complaint ¶ 2).

3. Plaintiff was employed by Regent as Director of Sales and Marketing at Regent's facility in Plainfield, Indiana. (Deposition of Thomas Ellison ("Plaintiff Dep.")

Ex. 2; *see also* Declaration of Tracy Ourhaan ("Ourhaan Dec."), Ex. A).

4. Survival Solutions is an emergency equipment product line of Regent. (Garvin Aff. ¶ 8). Survival Solutions' products and services include repairing, overhauling, and exchanging life vests, rafts, slides, fire/oxygen systems, and O2 bottles. (*Id.* ¶ 8; *see also* Plaintiff Dep. Ex. 3).

5. Plaintiff's customer accounts were related to Survival Solutions. (*See* Plaintiff's Ex. E (noting in an email that Plaintiff's primary job responsibility was Survival Equipment); *see also* Garvin Aff. ¶ 13). Plaintiff's job duties also included attending trade shows, making new contacts, and having knowledge of Regent's mission and the company's total capabilities. (Plaintiff Dep. at 51; Garvin Aff. ¶ 10).

6. Plaintiff's employment agreement with Regent provided that he was eligible for "company bonuses at the sole discretion of the Company" and sales commissions at varying rates for annual sales over and above $500,000. (Plaintiff Dep. Ex. 2).

7. Plaintiff's employment agreement does not specify the specific acts required to earn a sales credit toward a commission. Plaintiff testified that the determination of whether a sales representative has "earned" a commission is within the sole discretion of the President of Regent, Reza Soltanian ("Soltanian"). (Plaintiff Dep. at 42).

8. Plaintiff testified that on each of the customer accounts for which he received sales commission credit, he corresponded with the customer decision-makers, drafted

proposals, negotiated contracts, and acted as the customer's primary contact. (*Id*. at 86, 89-93, 95-96).

9. During Plaintiff's employment with Regent, each of the accounts for which Plaintiff received sales commission credit were for products and services supplied by Survival Solutions. (Garvin Aff. ¶¶ 14, 15). In fact, Plaintiff was never assigned any accounts for the sale of seating products. (Plaintiff Dep. at 51).

**B. Vision's Introduction**

10. In late April 2007, based on information from a friend, Tom Wolz ("Wolz"), Plaintiff learned that Vision Airlines ("Vision") was purchasing three Boeing 767-200s from United Airlines, and that they planned to convert the planes from a three class seating configuration to a VIP seating configuration, utilizing BE 960 seats in leather. (Plaintiff Dep. at 37; Plaintiff Dep. Ex. 3).

11. Plaintiff then sent an email to Brad Carucci ("Carucci") of Vision and "extolled the value of Regent Aerospace . . .". (Plaintiff Dep. at 37). Plaintiff followed up that email with a telephone call to Carucci. (*Id*. at 38).

12. During the conversation, Plaintiff invited Carucci to a Kentucky Derby party thrown by Wolz. (*Id*.). Carucci accepted the offer and brought David Meers ("Meers"), Vision's Vice President of Technical Operations. (*Id*. at 31, 38).

13. At the party, Plaintiff and Mike Lilley ("Lilley"), Vice President and General Manager of Regent's Plainfield facility, jointly invited the Vision representatives to tour Regent's Plainfield facility, and they accepted the offer. (*Id*. at 57-59).

4

14. During the plant tour, Plaintiff discussed Regent's capabilities, infrastructure, engineering support, equipment, knowledge, experience, and manpower. (*Id*. at 54-55). Plaintiff showed Carucci and Meers samples of Regent's BE 960 seats. (*Id*. at 60). Plaintiff informed the Vision representatives that they would need to speak with Garvin or Soltanian, regarding any seat project specifics and said he would have Garvin or Soltanian contact Vision. (*Id*. at 60-61). At the close of the tour, Plaintiff's understanding was that he was "to contact [Tim] and Reza and get them talking." (*Id*. at 62). Plaintiff testified that he had "now completed [his] job." (*Id*.).

15. Initially, Garvin was not interested in Vision as a prospective customer. Garvin told Plaintiff, "Don't waste your time with them, they don't even show up on the Federal Registry." (*Id*. at 53).

16. Around this time frame, Plaintiff received a phone call from Meers complaining that he was "tired of chasing Tim Garvin and Reza [Soltanian]." (Plaintiff Dep. at 31). Immediately following this telephone conversation, Plaintiff contacted Soltanian in California and told him to call Meers right away to smooth things over. (*Id*. at 32). After Soltanian's conversation with Meers, Soltanian contacted Plaintiff and told him that "they're going to put a deal together, good job bringing it in, they liked you very much, they liked our facility in Plainfield, I'll take it from here." (*Id*.).

5

### C. The Vision Agreement

17. On May 16, 2007, Vision representatives Carruci and Meers visited Regent's headquarters in Valencia, California. (Affidavit of Reza Soltanian ("Soltanian Aff.") ¶ 8). There, Soltanian spoke with the Vision representatives about their plan to refurbish three Boeing 767-200 aircraft. (*Id.* ¶ 9).

18. On May 17, 2007, Soltanian received Vision's layout of passenger accommodation ("LOPA"). (*Id.* ¶ 10). In addition to a seats matrix, drawings, and other specifications, the LOPA identified the B/E 960 BC seats that Vision requested modified to fifty inches. (*Id.*).

19. Soltanian completed a proposal that included upgrades of the galley equipment, video screen additions, and seat modifications to fit the fifty inch seat width requirement identified in the LOPA. (*Id.* ¶ 11). In addition, Soltanian included unit prices for galley seats, lavatories, storage cabinets, coffee makers, food and beverage carts, ovens, and tables. (Soltanian Aff. Ex. 1 at 1).

20. Plaintiff testified he had many conversations during this time frame with Carucci, wherein Carucci asked "[Plaintiff] to get back involved; that [Vision] has some significant disputes with Reza [Soltanian] with respect to funding, invoice payments and things like that." (Plaintiff Dep. at 61). Plaintiff also testified that he "acted as a referee and would convey [Carucci's] thoughts to Reza [Soltanian] in a respectful manner and try to keep the deal moving forward." (*Id.*).

21. On May 22, 2007, Meers responded to Regent's proposal by saying Regent's quote

was outside Vision's budget. (Soltanian Aff. ¶ 12). The following day, Soltanian emailed his response to Meers. (Soltanian Aff. Ex. 2).

22. Vision did not accept Regent's proposal. (Soltanian Aff. ¶ 14). Soltanian thereafter offered a modified proposal which, among other things, offered reduced prices for crew seats. (*Id*.).

23. After further negotiations, Vision and Regent ultimately reached an agreement in principal for Regent and Airbase Services, Inc. to provide the products and services for the Vision project. (*Id*. ¶ 17).

24. Soltanian assigned Dennis Jagard ("Jagard"), Regent's Director of Programs Management, as the project manager. (*Id*. ¶ 18).

25. On June 9, 2007, Jagard submitted Regent's proposed final agreement to Meers. (*Id*. ¶ 19). This agreement reflected the latest agreed upon pricing and Regent's understanding of the revised scope of the project. (*Id*.).

26. During the subsequent two weeks, Soltanian, with the assistance of others, worked with Vision to finalize the deal. (*Id*. ¶¶ 20-21).

27. On June 22, 2007, Soltanian signed the contract, "Agreement RAC1348F-B767-200," on behalf of Regent. (Soltanian Aff. Ex. 3). Carruci signed the contract on behalf of Vision. (*See id*.).

**D. Plaintiff's Bonus**

28. Plaintiff spoke with Steve Barnett ("Barnett"), Regent's Chief Financial Officer, as to why he had not been paid a commission on the Vision account. (Declaration of

Steve Barnett ("Barnett Dec.") ¶ 4).

29. Barnett approached Garvin and asked him about the status of Plaintiff's commission on the Vision account. (*Id*.).

30. Garvin informed Barnett that he and Soltanian were excluding the Vision Account from the calculation of Plaintiff's commissions because Garvin and Soltanian were the only qualified employees to work on the account, and Plaintiff was otherwise not entitled to a full commission. (*Id*.).

31. In September 2007, Regent paid Plaintiff a $10,000 bonus as an acknowledgment of his efforts with Vision. (*Id*.; *see also* Soltanian Aff. ¶ 25).

## III. Discussion

### A. Wage Payment Statute

#### 1. Procuring Cause

Plaintiff's cause of action is a claim for wages under the Indiana Wage Payment Statute, Indiana Code § 22-2-5-1 *et seq*. Indiana law provides that commissions are "wages" under the statute so long as they are not based solely upon the profitability of the employer's business. *McCausland v. Walter USA, Inc.*, 918 N.E.2d 420, 424-25 (Ind. Ct. App. 2009). As neither party addresses this issue, the court presumes that Plaintiff meets this threshold requirement. Moreover, the employment agreement does not address the specific steps a salesman must take in order to earn a sales commission. Thus, in support of this theory that he is entitled to commission credit for the Vision agreement, Plaintiff relies upon the doctrine of procuring cause.

The procuring cause doctrine is a "common law doctrine that . . . is securely part of the law of Indiana." *Harold Wright Co. v. E.I. DuPont De Nemours & Co., Inc.*, 49 F.3d 308, 309 (7th Cir. 1995). Under the procuring cause theory, an agent is entitled to be compensated by his principal "for a deal of which the agent is the 'procuring cause,' even if he has been cut out of the deal, preventing him from doing the work for which the agency contract entitled him to be compensated." *Id.* The purpose of this rule is to protect the sales person who was cut out of the deal prior to the culmination of a sale, "but after he or she has done everything necessary to effect the sale." *Furth v. Inc. Publ'g Corp.*, 823 F.2d 1178, 1180 (7th Cir. 1987).

Here, there is no dispute Plaintiff was the individual who first introduced Vision representatives, Carucci and Meers, to Regent. He and Lilley spoke with Carucci and Meers at a Kentucky Derby party, and then gave them a tour of Regent's Plainfield facility. At the conclusion of the tour, Plaintiff testified that he informed Carucci and Meers that he would "have Tim Garvin, our Vice President of Sales, or Reza Soltanian, our Owner and President, contact you from our Seating Division." (Plaintiff Dep. at 38-39). Plaintiff further clarified his lack of any future role as Vision representatives left the Plainfield facility:

> Q: Okay. And as you left, your understanding was you were to contact Tim [Garvin] and Reza [Soltanian] and get them talking.
>
> A: Absolutely. I had now completed my job.

(*Id.* at 61).

9

At the time Plaintiff and Lilley directed Vision to Garvin and Soltanian and the staff in Valencia, there was no proposal, no engineering or product specifications, and, most definitely, no agreement. Significantly, Plaintiff concedes that he had no role in the actual negotiation process. (*Id*. at 62) ("Q: Did you have any responsibility for negotiating the deal or making the sale at any point after the visit to the facility? A: No, sir, I did not.").

Plaintiff attempts to revive his claim by citing to the fact that: (1) Garvin was not initially interested in an agreement with Vision; (2) Meers called him complaining that he could not get in touch with Garvin or Soltanian; and (3) Carucci called him on several occasions asking him to get involved, and that he acted as "referee" between Carucci and Soltanian. In essence, Plaintiff argues that were it not for him, the lucrative agreement between Regent and Vision would not have come to pass.

The problem with Plaintiff's argument is that, even when this testimony is viewed in the light most favorable to him, at most it shows that he "kept negotiations alive." Such evidence is a far cry from a finding that he did "everything necessary to effect the sale." *See Furth*, 823 F.2d at 1180; *see also McGee v. Brae Transp., Inc.*, 1985 U.S. Dist. LEXIS 12736, at * 12 (N.D. Ill. Dec. 16, 1985) (finding that although McGee's "efforts were solely responsible for keeping the negotiations alive," he did not procure the sale because he was dismissed before the parties were ever "even close to concluding the transaction.").

In addition, to find otherwise would conflict with past practice. The evidence is

undisputed that Plaintiff received commissions only for sales completed in his area of expertise, Survival Solutions. (Garvin Aff. ¶¶ 14, 15). Although he was required to have knowledge of Regent's other product lines for purposes of handling customer or prospective customer inquiries, it is undisputed that before he received a commission in the past, he had: (1) corresponded with the customer decision-makers, (2) drafted proposals, (3) negotiated contracts, and (4) acted as the customer's primary contact. (Plaintiff Dep. at 86, 89-93, 95-96). Taking the facts in the light most favorable to Plaintiff, there is no evidence that critical events numbered 2, 3, and 4 occurred here.

Finally, the fact that Plaintiff referred Carucci and Meers to Garvin and Soltanian, after giving them a tour of the Plainfield facility, speaks volumes as to what he correctly perceived his role to be – that of a facilitator for the business in an area that was outside of his customer account base. For these reasons, the court finds that Plaintiff has failed to present sufficient evidence supporting his claim that he was the "procuring cause" of the Vision agreement.

### 2. Prevention

In his quest for sales commission credit for the Vision deal, Plaintiff also invokes the doctrine of prevention. Under the doctrine of prevention, "'a party to a contract [who] prevents the fulfillment of a condition or its performance by the adverse party . . . cannot rely on such condition to defeat his liability.'" *Drumm v. Morningstar, Inc.*, 2009 U.S. Dist. LEXIS 94358, at *8 (N.D. Cal. Oct. 8, 2009) (quoting *Unruh v. Smith*, 123 Cal. App. 2d 431, 437 (1954)). In support of this theory, Plaintiff argues that: (1) he was

responsible for selling all aspects of Regent's products and services, and (2) that Garvin and Soltanian "cut him out" of the deal by ordering Plaintiff to refer all seating accounts to them.

Garvin, as the Vice President of Sales, testified that he only assigned Plaintiff accounts relating to Survival Solutions. (Garvin Aff. ¶ 14). Plaintiff attempts to raise an issue of fact by noting that he was ultimately responsible for all sales at the facility. In support, he contends that with respect to an account he held with Delta Airlines ("Delta"), "[he] was responsible for drafting seating proposals." (Response Brief at 13). A review of his testimony, however, shows that this was primarily a Survival Solutions account. (*See* Plaintiff Dep. at 88-92). Indeed, following a deal with Delta, he testified that he was the customer service representative on issues relating to certain life preservers that Delta purchased. (*Id*. at 91-92). In sum, Plaintiff did not present evidence contradicting Garvin's testimony that he only received commissions on Survival Solutions' accounts. (Garvin Aff. ¶ 15). Thus, the fact that Soltanian, in his discretion, did not award Plaintiff sales commission credit is consistent with past practice.

Moreover, Plaintiff was not "cut out" of the deal. Plaintiff testified that after he gave Carucci and Meers a tour of the Plainfield facility, he informed them that he would have Garvin and Soltanian contact them from the Seating Division. (*Id*. at 39). After Soltanian contacted the Vision representatives, Soltanian called Plaintiff to thank him for his efforts and said, "I'll take it from here." (*Id*. at 39, 62). As noted above, this too is entirely consistent with past practice.

In conclusion, the court finds that there is insufficient evidence from which the court can infer that Plaintiff was prevented from pursuing the deal with Vision. Accordingly, the court must **GRANT** Regent's motion for summary judgment on Plaintiff's claim under Indiana's Wage Payment Statute.

### B. Breach of Contract

Plaintiff also brings a breach of contract claim. He alleges that Regent breached his employment contract by failing to pay him a sales commission for the Vision agreement. Because the court has found that he was not entitled to commission credit for that deal, the court must also **GRANT** Regent's motion for summary judgment on that claim as well.

### IV. Conclusion

For the reasons set forth above, the court **GRANTS** Regent's Motion for Summary Judgment (Docket # 39).

**SO ORDERED** this 29th day of September 2010.

                                                                    _____
                                                                    RICHARD L. YOUNG, CHIEF JUDGE
                                                                    United States District Court
                                                                    Southern District of Indiana

Electronic Copies to:

Adam Harper Berry
LITTLER MENDELSON PC
aberry@littler.com

Sylvia Abra Bier
LITTLER MENDELSON, P.C.
sbier@littler.com

Denise K. LaRue
HASKIN LAUTER & LARUE
dlarue@hlllaw.com

Kenneth E. Lauter
LAW OFFICES OF LAWRENCE M. REUBEN
lauter@reubenlaw.net

Meghan Uzzi Lehner
HASKIN LAUTER & LARUE
mlehner@hllglaw.com

Alan L. McLaughlin
LITTLER MENDELSON PC
amclaughlin@littler.com

Bradley L. Wilson
HASKIN LAUTER & LARUE
bwilson@hlllaw.com